**Ryan S. Jennings, OSB No. 052931**
rsj@gattilaw.com
**James M. Healy, OSB No. 123403**
jhealy@gattilaw.com
The Gatti Law Firm
235 Front St. SE, Ste. 200
Salem, OR 97301
(p): 503-363-3443
(f):  503-371-2482
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| TIMOTHY M. WOOD, Personal Representative of the ESTATE OF HUNTER LEE NOLAND, a deceased child,<br><br>    Plaintiff,<br><br>vs.<br><br>THE STATE OF OREGON, by and through its DEPARTMENT OF HUMAN SERVICES; BARBARA ANN MOORE, an individual; MICHAEL RAYMOND MOORE, an individual; and DOES I, II and III, as individuals,<br><br>    Defendants. | Case No.<br><br>COMPLAINT (Alleging Civil Rights Violations, Negligence, and Wrongful Death Claims)<br><br>(Jury Trial Requested) |

Plaintiff alleges that at all relevant times:

1.

All the relevant acts occurred in Lincoln County, Oregon.

/ / /

Page 1 -   COMPLAINT

2.

This Court has jurisdiction over the federal claims alleged herein pursuant to 42 USC §1983, 28 USC §1343(3), and 28 USC §133.  It has supplemental jurisdiction over the state law claims pursuant to 28 USC §1367(a). Venue in this Court is proper as provided by LR 3-2(3).

3.

Plaintiff Timothy M. Wood is the duly appointed Personal Representative of the Estate of Hunter Lee Noland, a deceased child, by Order of the Lincoln County Circuit Court in Probate Case No. 22PB04949.

4.

Defendant Oregon Department of Human Services (DHS) is an agency of the State of Oregon. Pursuant to ORS Chapter 418, and the DHS administrative rules promulgated under that authority, DHS operates the State of Oregon's Child Welfare Program, which in turn operates DHS programs to administer and certify DHS foster homes and foster parents.  DHS acts *in loco parentis* for Oregon foster children in the care and custody of the State of Oregon.

5.

At all relevant times, Defendant Barbara Ann Moore and Defendant Raymond Moore were individuals and DHS certified foster parents who operated a DHS certified foster home in South Beach, Lincoln County, Oregon. They were paid for their service by DHS and operated under DHS' certification rules and directions.  At all relevant times, Defendants Moore acted within the course and scope of their agency and/or employment with DHS and under the color of state law.

6.

At all relevant times, Hunter Lee Noland (Hunter) was a five-year-old foster child in the care and custody of the Oregon Department of Human Services (DHS). He came into foster care

on the recommendation of DHS and by the Order of the Lincoln County Circuit Court, Juvenile Division.

7.

At all relevant times, DHS and Hunter Noland's foster parents knew that Hunter suffered from mental health and emotional conditions before and during his foster care placement which made him significantly less likely to follow adult instructions or to refrain from dangerous behavior.

8.

Defendants Doe I through III were DHS employees. The names of Defendants Doe are presently unknown to Plaintiff. Plaintiff will file an Amended Complaint to identify the individual Defendants Doe and more particularly detail their conduct after discovery is complete. Defendant Doe I was Hunter's assigned DHS child welfare caseworker. Defendant Doe II was the DHS assigned foster home certifier for Defendants Moore and their DHS foster home. Defendant Doe III was the DHS supervisor of Does I and II. Together, Defendants I, II, and III were responsible for certifying and supervising Defendant Moore's DHS foster home.

9.

At all relevant times, Defendants Moore and Defendants Doe were acting within the course and scope of their agency and/or employment with DHS and were acting under color of state law.

10.

During February of 2021, DHS placed Hunter Lee Noland into the DHS foster home operated by Defendants Moore. Hunter remained in that foster home until his death on or about July 27, 2021.

/ / /

Page 3 -   COMPLAINT

11.

On July 27, 2021, Defendants Moore hosted a barbeque gathering at their certified foster home for friends, family, and foster children. A grill was set up outside on a deck adjacent to the indoor kitchen. Multiple adult guests circulated inside and outside and several children played inside and outside of the home on this date.

12.

Defendants Moore, Defendants Doe, and DHS knew or should have known that one or more of the following unreasonable and unsafe conditions existed at Defendant Moore's certified foster home on or before July 27, 2021:

a. Defendants Moore erected a trampoline and a bounce house on their side yard and expected children to play on that equipment. The side yard was perpendicular to the deck and was only in partial view from the deck and backyard area where the adults had congregated.

b. When the Moores purchased the trampoline prior to July 27, 2021, it was equipped with a safety enclosure comprised of flexible poles and safety netting and a door that was to be zipped shut when children were playing inside. The safety enclosure was necessary to prevent children from jumping outside the confines of the trampoline, risking serious injury by impacting the ground or adjacent objects. Without the safety enclosure, it was reasonably foreseeable that unsupervised, unconstrained children would engage in dangerous play, including bouncing onto and off the trampoline's surface. The removal of the safety enclosure made the trampoline defective and unreasonably dangerous for children.

/ / /

    c. Defendants Moore removed the safety enclosure, and still encouraged children to play on what was then a defective and unreasonably dangerous trampoline.

    d. Defendants Moore erected an inflatable "bounce house" and put it next to the trampoline, with the expectation that children would play on it. It was affixed to the ground by a series of cords and ground stakes. The bounce house was defective and unreasonably dangerous for children to use due to its immediate proximity to the defective trampoline, among other reasons. It was reasonably foreseeable that children would try to jump from the defective trampoline onto the bounce house, and thereby risk serious injury, by rebounding and impacting the ground or by getting tangled in the bounce house and/or its rigging;

    e. Adults did not reasonably supervise the children's use of the defective trampoline and the bounce house, as required by manufacturer's instructions and as would otherwise be reasonably necessary.

    f. Such other unreasonable and unsafe conditions existed as may be identified in the discovery of this case.

<div style="text-align:center">13.</div>

During the afternoon of July 27, 2021, before the accident alleged below, children told Defendant Barbara Ann Moore that Hunter Noland was jumping from the trampoline onto the bounce house and that he was wearing toy binoculars strapped around his neck. Defendant Barbara Ann Moore told the children to deflate the bounce house and to stop using it, and she took the binoculars from Hunter Noland. Later that afternoon Defendant Barbara Ann Moore changed her mind and allowed the children to re-inflate the bounce house and to continue playing on it and the trampoline, and she returned the binoculars to Hunter Noland. At the time of the accident alleged

below, there was no adult supervision or unreasonable supervision of the children playing on the trampoline and bounce house.

14.

Hunter Noland attempted to jump from the defective trampoline onto the bounce house. The binocular strap around his neck caught on the bounce house and/or its supporting fixtures and rigging. Hunter Noland could not remove himself from what effectively was a noose. He was strangled to death.

15.

Adults did not see the accident take place. Adults did not respond to the accident scene until another child told Defendant Barbara Ann Moore that Hunter Noland was "sleeping" next to the bounce house. Defendant Barbara Ann Moore responded by telling the child to awaken Hunter. Some minutes later, a child then reported to Defendant Barbara Ann Moore that Hunter would not wake up. Adults then went to the accident scene to see what was happening. They discovered Hunter on the ground, apparently unconscious, with the binocular cord twisted on his neck. The adults on scene, responding police, paramedics, and, thereafter, hospital emergency room medical staff were not able to revive Hunter Noland. He died as a result of his injuries.

16.

But for the accident alleged herein, Hunter Noland would reasonably have been expected to live an additional 64 years, or to approximately 71 years of age, according to the current United States Social Security Administration mortality tables.

17.

It was reasonably foreseeable that Defendants' actions and inactions, as alleged in this Complaint, would cause Hunter Noland to suffer serious physical injuries or death and, in fact,

Page 6 -   COMPLAINT

were a cause of his serious physical injuries and death. The actions and inactions were a reasonably foreseeable cause of the economic and non-economic damages alleged below.

18.

Defendants' actions caused Hunter Lee Noland and his Estate to suffer non-economic damages in a reasonable amount to be determined by a jury at the time of trial, comprised of:

a) The reasonable compensation for the distress, panic, fear, physical pain, and asphyxiation Hunter Noland suffered between the time of his injury and his death; and

b) The loss of society and companionship sustained by his Estate, and by the loss of joy, love, affection, guidance, moral training, and education Hunter Noland would have been expected to provide the beneficiaries of his Estate had he lived.

19.

Defendants' actions caused the Estate of Hunter Lee Noland to suffer economic damages in a reasonable amount to be determined by a jury at the time of trial, and to be comprised of:

a) The reasonable and necessary charges incurred by the Estate for doctors' services, hospital services, nursing services, rehabilitative services, and other health care services, burial services, and memorial services rendered for Hunter Noland; and

b) The reasonable value of wages, earnings, and/or lost earning capacity of Hunter Noland to the Estate;

20.

Adequate and timely written notice of tort claim was provided to the State of Oregon, Department of Administrative Services, as required by the Oregon Tort Claims Act.

/ / /

/ / /

Page 7 -   COMPLAINT

21.

Plaintiff is entitled to recover the reasonable value of the attorney's fees and costs incurred in bringing the civil rights actions, as provided by 42 USC §1981.

**FIRST CLAIM FOR RELIEF**
(42 U.S.C. §1983 Claim against Barbara Ann Moore and Michael Raymond Moore
Substantive Due Process; Danger Creation)

22.

Plaintiff realleges the facts set forth above.

23.

Hunter Noland had the fundamental, constitutional right to bodily autonomy, which included the right to be free from physical injury and physical pain. This is a right guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

24.

Defendants, and each of them, during all times alleged herein, were acting under color of state law. They were acting within the course and scope of their employment and/or agency with the State of Oregon, Department of Human Services.

25.

DHS, Defendants Moore, and Defendants Doe had a special relationship with Hunter Lee Noland because he was involuntarily placed into the care and custody of DHS, into the State's foster care system and into Defendant Moore's DHS certified foster home, all as alleged above.

26.

Defendants Moore, while acting as the designated agent of DHS tasked with the day-to-day care, supervision, and support of Hunter Noland, affirmatively placed Hunter Noland into a

Page 8 -   COMPLAINT

known or obvious danger he would not have otherwise encountered, and created a risk of serious injury of the kind suffered by Hunter Noland, by:

    a) Allowing children to play on a defective trampoline they knew to be unreasonably dangerous for children;

    b) Allowing Hunter Noland to wear toy binoculars strapped around his neck while playing on the defective trampoline;

    c) Allowing children to engage in unreasonably dangerous activities, to include jumping off the defective trampoline onto the bounce house;

    d) Failing to provide reasonable adult supervision of the children playing on the defective trampoline and the bounce house;

    e) Failing to provide enhanced, adult supervision of Hunter Noland that was necessary because of the disabilities alleged above;

    f) Placing the defective trampoline and the bounce in a location that was not reasonably visible to adults;

    g) Placing the bounce-house in such a close proximity to the defective trampoline that it would be foreseeable that children would engage in the dangerous behavior of attempting to jump from one to the other;

    h) Allowing the foregoing to continue after other children warned Defendants Moore that Hunter Noland was unsafely jumping from the defective trampoline onto the bounce house, while wearing a set of toy binoculars strapped around his neck; and

    i) By engaging in such other conduct as may be identified in the discovery of this case.

///

27.

Defendants Moore, and each of them, were deliberately indifferent to the known and obvious danger to Hunter Noland in that they recognized the unreasonable risks to him, as alleged above, and intended to expose him to those risks without regard to the consequences to Hunter Noland.

28.

Through their conduct, Defendants Barbara Ann Moore and Michael Raymond Moore, and each of them, violated Hunter Noland's constitutional right to bodily integrity and were a cause of the injuries and death of Hunter Noland, and the damage alleged above.

**SECOND CLAIM FOR RELIEF**
(42 U.S.C. §1983 Claim against Defendants DOE I, II and III; 42 U.S.C. Substantive Due Process; Danger Creation)

29.

Plaintiff realleges all of the facts set forth above.

30.

DHS trains its employees that it is "essential" for all DHS caseworkers who conduct face-to-face visits at a certified foster home to confirm during their visits that the foster home provides a safe environment for children. DHS' policy provides that "every contact with a certified family" is an opportunity for the ongoing assessment of the foster parents' ability to provide a safe foster home.

31.

DHS trains and requires its child welfare caseworkers to visit certified foster homes at least every 180 days to assess conditions related to the ongoing safety of foster children. The caseworkers, during those visits, are required to conduct a Safety Assessment of the physical

environment of the entire home to ensure continued compliance with certification standards. Observations of the physical environment must be documented in DHS records.

32.

DHS trains and requires its child welfare caseworkers to visit certified foster homes more frequently, at least every 90 days, if DHS management has approved placing more foster children in the home than DHS previously determined was the maximum capacity of the foster home.

33.

DHS trains and requires its foster home certifiers to visit certified foster homes at least once every 180 days, to confirm a safe environment is provided to foster children. The certifier must conduct a Safety Assessment of the physical environment at the certified home. Among other things, the certifier must assess the amount of care and supervision required for each child in the home, the level of stress the responsibility of substitute care giving adds to the home, and the certified family's ability and willingness to provide the level of supervision required in the supervision plan created for each foster child and tailored to the child's needs.

34.

DHS trains and requires its child welfare caseworkers and foster home certifiers that, upon identification of conditions that do not support the ongoing safety, health, and well-being of foster children placed at a foster home, they must take affirmative action to eliminate the unsafe conditions, or foster children must be removed from the home.

35.

DHS instructed Defendants Moore that they were required to comply with DHS certifications, policies, and rules which apply to foster parents, and Defendants Moore agreed to comply with those duties. Those duties included that they were to make their foster home

reasonably safe for foster children assigned there, to abide by DHS rules regarding home safety, and to keep the foster home free from conditions that put children in danger of incurring serious physical injury or death.

36.

Defendants Doe unreasonably failed to follow the above training and instructions. They failed to remove Hunter Lee Noland from Defendant Moore's certified foster home, and failed to eliminate the dangerous conditions alleged above, despite that:

a) They knew of one or more of the dangerous conditions alleged above and failed to cause the dangerous conditions to be rendered safe;

b) They failed to inform Defendants Moore that Hunter Noland needed enhanced adult supervision because he suffered from mental health and/or emotional disabilities;

c) They placed an unreasonable number of foster children in Defendants Moore's foster home, which unreasonably reduced the Moores' ability to safely supervise foster children, especially children with the heightened supervision needs of Hunter Noland; and

d) In such other ways as may be identified in the discovery of this case.

37.

Defendants Doe, and each of them, were deliberately indifferent to the known and obvious danger to Hunter Noland in that they recognized unreasonable risks to him, as alleged above, and intended to expose him to those risks without regard to the consequences to Hunter Lee Noland.

38.

Defendants Doe, and each of them, violated Hunter Noland's constitutional rights through their acts and omissions, as alleged above, and were a cause of the damages alleged above.

## THIRD CLAIM FOR RELIEF
(Wrongful Death/Negligence Claim Against DHS)

39.

Plaintiff realleges each of the facts set forth above.

40.

This wrongful death claim is authorized by ORS 30.020.

41.

DHS is responsible for managing DHS certified foster homes and for conducting periodic formal and informal assessments of foster homes to ensure those homes are providing safe and protective care to foster children placed there, including Hunter Noland;

42

DHS, by and through its caseworkers, foster home certifiers, and certified foster parents, knew or should have known of the unreasonably dangerous conditions alleged above.

43.

DHS, by and through its agents and employees, including Defendants Moore, engaged in the following unreasonable conduct:

a) DHS failed to identify and remove the defective and unreasonably dangerous conditions alleged above;

b) DHS failed to reasonably inform Defendants Moore that Hunter Lee Noland required enhanced adult supervision compared to other foster children due to his mental and emotional disabilities;

c) DHS failed to prepare and maintain a reasonable care plan for Hunter Noland, which accounted for his need for enhanced adult supervision, and failed to share the details of such a plan with Defendants Moore;

Case 6:23-cv-01015-MK   Document 1   Filed 07/11/23   Page 14 of 15

    d)  DHS placed an unreasonable number of foster children in the foster home, and thereby, unreasonably reduced Defendants Moore's time and ability to reasonably and safely supervise Noland Hunter;

    e)  DHS failed to reasonably train its caseworkers, certifiers and foster parents of the unreasonable danger caused by the acts and omissions alleged above; and

    f)  DHS failed in such other particulars as may be identified in the discovery of this case.

<div align="center">44.</div>

DHS' negligence was a cause of the injuries and death suffered by Hunter Lee Noland and the damages alleged above.

**WHEREFORE,** Plaintiff asks that a money judgment be entered in favor of the Estate of Hunter Lee Noland as follows:

    A.  Economic damages upon each Claim for Relief in an amount to be determined reasonable by a jury;

    B.  Non-economic damages upon each Claim for Relief in the amount to be determined reasonable by a jury;

    C.  Attorney's fees and costs upon each of the First and Second Claims for Relief alleging civil rights violations; and

    D.  Such other relief as the Court may deem reasonably appropriate to the circumstances of this case.

/ / /

/ / /

Page 14 -   COMPLAINT

DATED this  11th  day of July, 2023.

        THE GATTI LAW FIRM

        /s/    James M. Healy
        **Ryan S. Jennings, OSB No. 052931**
        rsj@gattilaw.com
        **James M. Healy, OSB No. 123403**
        jhealy@gattilaw.com
        The Gatti Law Firm
        235 Front St. SE, Ste. 200
        Salem, OR 97301
        (p): 503-363-3443
        (f):  503-371-2482
        Attorney for Plaintiff